```
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/1/2013
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

SHANTI NOVAK,

                          Plaintiff,

          -v-

WATERFRONT COMMISSION OF NEW
YORK HARBOR, et al.,

                        Defendants.

------------------------------------------------------------X

No. 10 Civ. 9694 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

    Plaintiff Shanti Novak brings this action against Defendants Waterfront Commission of New York Harbor, Captain Scott Politano, Chief John Hennelly and Sergeant Kristen Brylinski (collectively, "Defendants"). Novak asserts claims of sex discrimination under Title VII of the Civil Rights Act of 1964 and sex discrimination and retaliation under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290, et seq., and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101, et seq. She also asserts state common law claims for negligent supervision or retention of an unfit employee, intentional infliction of emotional distress and *prima facie* tort. Before the Court is Defendants' motion for summary judgment. For the reasons set forth below, the motion is granted in its entirety.

## BACKGROUND[1]

Novak is currently employed as a detective in the Police Division of the Waterfront Commission, a bi-state agency created to investigate and combat criminal activity and influence in the ports of New York and New Jersey. (56.1 Stmt. ¶¶ 1-2.) Novak began working for the Commission in May 2003 as a police dispatcher and, in December 2005, was hired as a detective and assigned to the Commission's New Jersey field office. (Id. ¶¶ 6-7.)

In or around July 2006, Novak began dating Politano, at the time a detective in the Commission's Brooklyn field office. (Id. ¶ 8.) Their relationship, well-known in the Police Division, progressed and the two became live-in partners. (Compl. ¶¶ 18-19.) In December 2006, Politano was promoted to Lieutenant and, in May 2007, was transferred to the New Jersey field office, thereby becoming Novak's supervisor. (56.1 Stmt. ¶¶ 9-11.) Novak terminated her relationship with Politano shortly thereafter, in June or July 2007. (Id. ¶ 12.)

Novak's breakup with Politano led to an uncomfortable work environment for Novak,

---

[1] The following is drawn from undisputed allegations in the Complaint ("Compl."), Defendants' Rule 56.1 Statement of Undisputed Material Facts ("56.1 Stmt.") and the exhibits attached to the Affidavit of Melissa A. Provost in Support of Defendants' Motion for Summary Judgment ("Provost Aff."). Novak failed to submit a responsive Rule 56.1 statement as required by Local Civil Rule 56.1, and the Court therefore deems the facts contained in Defendants' Rule 56.1 Statement admitted and uncontroverted. See Galasso v. Eisman, Zucker, Klein & Ruttenberg, 310 F. Supp. 2d 569, 574 (S.D.N.Y. 2004) ("If a party opposing a motion for summary judgment does not submit a Rule 56.1 Statement, the factual assertions contained in the movant's Statement are deemed admitted and uncontroverted.") (citing Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 72-74 (2d Cir. 2001)). Furthermore, Novak's Memorandum of Law ("Opposition") fails to cite to, or attach, *any* evidence from the record in this case. Instead, the Opposition makes only passing references to portions of Novak's unverified Complaint and to materials submitted in connection with the parties' proceedings before the New York State Division of Human Rights ("DHR"), which Novak annexed to her June 22, 2011 opposition to Defendants' motion to dismiss. (Dkt. 20.) The Court declines to consider Novak's unsupported allegations in her Opposition or Complaint on this motion. See Continental Ins. Co. v. Atlantic Cas. Ins. Co., No. 07 Civ. 3635 (DC), 2009 WL 1564144, at *1 n.1 (S.D.N.Y. June 4, 2009) ("On a motion for summary judgment . . . allegations in an unverified complaint cannot be considered as evidence. The Court has not relied on any disputed allegations not supported by evidentiary materials.") (citation omitted). However, while the Court notes that it is not obligated to "perform an independent review of the record to find proof of a factual dispute," Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470-71 (2d Cir. 2002), it has reviewed the verified pleadings and sworn affidavits submitted in connection with the parties' DHR proceedings and will rely on them to the extent they are relevant to the instant motion. See Fitzgerald v. Henderson, 251 F.3d 345, 361 (2d Cir. 2001). Specifically, this Opinion references paragraphs from Novak's December 19, 2008 verified DHR complaint ("First DHR Complaint"), her January 5, 2009 verified DHR complaint ("Second DHR Complaint") and from the March 18, 2009 Affidavit of Ramon Martinez ("Martinez Aff."). (See Dkts. 20-2, 20-4.)

which continued even after Politano was replaced by Brylinski as Novak's supervisor. (Id. ¶ 13; Provost Aff. Ex. A (Transcript of the Deposition of Shanti Novak Kurschner) at 224:15-225:14.) According to Novak, Politano and Brylinski "treated [her] differently than everyone else in [her] squad," subjected her to excessive scrutiny, and otherwise "belittled," "spoke down to" and made "an example of" her. (56.1 Stmt. ¶ 38; First DHR Compl. ¶ 7; Provost Aff. Ex. A at 224:15-225:14.) Specifically, Novak asserts that, following her breakup with Politano:

- she was given unfavorable work assignments, including being assigned to office duty, and was removed from an assignment in which she assisted two other detectives assigned to an FBI task force. (56.1 Stmt. ¶¶ 14, 17; First DHR Compl. ¶ 8.);

- she did "not receive[] any further formal Detective training, even though [she] had] witnessed many co-workers being permitted to attend training." (First DHR Compl. ¶ 9.);

- her name was removed from an email regarding a shooting range schedule. (56.1 Stmt. ¶ 14.);

- Politano and Brylinski required her to work more Sundays and night shifts than other detectives and denied her requests to change shifts with fellow detectives. (Provost Aff. Ex. A at 250:9-18, 250:22-251:8; 56.1 Stmt. ¶ 38; First DHR Compl. ¶¶ 10, 12.) Ramon Martinez, former Administrative Sergeant at the Commission averred that Politano scheduled Novak (and four other detectives) to work twice as many 3:00 p.m. to 11:00 p.m. shifts as certain other detectives. (Martinez Aff. 1.);

- she was the only detective to whom newly hired detectives were not assigned, which was both an "insult" as it "show[ed] that [her superiors] d[id]n't think [she was] competent enough to have another detective with [her]" and also deprived Novak the opportunity to "learn from them" as they were "seasoned detectives that came from [other] agenc[ies]." (Provost Aff. Ex. A at 176:11-177:12.);

- Politano often raised his voice and spoke to her in a "harsh tone of voice" or in a disrespectful manner. (56.1 Stmt. ¶ 13; Provost Aff. Ex. A at 117:21-118:18.);

- Politano sarcastically remarked "Can't your boyfriend go a day without you?" when Novak, who in late 2008 became engaged to be married, requested a day off. (First DHR Compl. ¶ 11.);

- after she complained to the DHR, Politano "wouldn't even communicate with"

3

Novak and gave her orders only indirectly through detectives junior to her. (Provost Aff. Ex. A 117:11-118:18; Martinez Aff. 1.);

- Brylinski once asked Novak to produce a case management form during morning roll call, which she apparently did not ask of other detectives. (Provost Aff. Ex. A at 178:16-21.);

- Brylinski questioned whether Novak was entitled to certain overtime pay. (56.1 Stmt. ¶ 38.); and

- Hennelly, the Commission's Chief, asked another officer to visit Novak at her home to ensure she was there on a day she called in sick. (Id. ¶ 36.)[2]

Novak filed her First DHR Complaint on December 19, 2008, alleging that "immediately after . . . [her] split with Lt. Politano," she began to be subjected to various of the above-listed "unlawful discriminatory actions." (First DHR Complaint ¶¶ 1, 7-8; 56.1 Stmt. ¶ 20.) Shortly thereafter, on January 5, 2009, Novak filed her Second DHR Complaint, alleging claims of continued discrimination and also a claim that she was retaliated against for filing the First DHR Complaint. (Dkt. 20-4; 56.1 Stmt. ¶ 27.) The alleged retaliation took the form of a written "memoranda of counseling" Novak and another detective received in connection with a December 11, 2008 incident whereby they arrived forty-five minutes late to a mandatory department-wide training session. (Dkt. 20-4; 56.1 Stmt. ¶¶ 19, 21, 23; Provost Aff. Exs. E, F, G, H.)

As a result of the stress she felt from her job, Novak experienced stomach problems, headaches, sore throats and heart palpitations. (56.1 Stmt. ¶ 59.) Novak visited a psychologist to address depression and anxiety, though she never sought medical treatment for her physical conditions or took medication for any emotional condition. (Id. ¶¶ 57, 60-61; Provost Aff. Ex. A at 227:10-18.)

---

[2] Hennelly's request followed a review of Novak's sick leave performance, which was determined to be "below standard." (Provost Aff. Ex. I.)

At no point during the relevant period was Novak terminated or suspended, nor did she suffer a loss of pay or other compensation, such as sick time or vacation time. (56.1 Stmt. ¶¶ 25, 51, 53.) Novak was never demoted or denied an opportunity for promotion, and she was never formally disciplined during her employment at the Commission.[3] (Id. ¶¶ 52, 54-55.)

Novak filed the Complaint in this action on December 30, 2010. (Dkt. 1.) Defendants moved to dismiss on April 21, 2011. (Id. 11.) In an October 17, 2011 Order ("2011 Order"), Judge Castel, to whom this case was previously assigned, dismissed Novak's Title VII claims against the individual Defendants, but otherwise denied the motion. (Id. 24.) Following discovery, Defendants filed the instant motion. (Id. 39.)

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law,'" and "[a]n issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A court reviewing a motion for summary judgment must 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003)). Although the Second Circuit has noted that "an extra measure of caution" is needed in

---

[3] The parties do not dispute that a memorandum of counseling does not constitute formal discipline. (Id. ¶ 25; Provost Aff. Ex. A at 110:18-24 (Q. . . . [H]ow many times have you been disciplined by the Waterfront Commission? A. I've been disciplined by the Waterfront Commission – let me just think. Well, if you use the word 'discipline,' zero.).)

5

granting summary judgment in discrimination cases since direct evidence of discriminatory intent is rare, summary judgment nonetheless "remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citations omitted); Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

## DISCUSSION

### 1. Title VII Discrimination

Title VII provides that it is an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Courts analyze the legal sufficiency of a sex discrimination claim under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under that framework, Novak must first establish a *prima facie* case of discrimination by showing that she is within a protected class, she was qualified for the position, she was subject to an adverse employment action, and the adverse action occurred under circumstances giving rise to an inference of discrimination. Leibowitz v. Cornell Univ., 584 F.3d 487, 498 (2d Cir. 2009).

If a plaintiff establishes a *prima facie* case, "the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse act." Id. at 498-99 (internal quotation marks omitted). If the defendant carries that burden, the burden shifts back to the plaintiff to demonstrate that the legitimate reasons offered by the defendant were a pretext for discrimination. Id. at 499. "The ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Defendants do not dispute that Novak is a member of a protected class and that she is qualified for her position. Defendants argue, however, that Novak cannot satisfy the remaining elements of her *prima facie* case. As discussed below, the Court agrees.

### a. Inference of Discrimination

As explained by the Second Circuit, "[t]he *sine qua non* of a gender-based discriminatory action claim under Title VII is that 'the discrimination must be *because of* sex.'" Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007) (emphasis in original) (quoting Leibovitz v. N.Y.C. Transit Auth., 252 F.3d 179, 189 (2d Cir. 2001)); Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work . . . is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic.").

In this case, there is simply no evidence that would permit a rational juror to conclude that Novak was subjected to unfair treatment because she is a woman. There is evidence, however, that she was treated unfairly due to animus resulting from her decision to end her consensual relationship. Indeed, as Novak testified at her deposition, she believes the discrimination to which she was allegedly subjected stems directly from her decision to break up with Politano. See Provost Aff. Ex. A at 91:24-92:8 ("Q. Is it your understanding or impression that [Politano] treated you that way [*i.e.*, different that her co-workers], raising his voice, disrespecting you, speaking to you in a disrespectful manner, because of the fact that you two had broken up? A. Yes, absolutely. Q. Okay. Was there another reason for it? No."); see also id. at 124:24-126:8 ("Q. Is it your allegation that you were reassigned from [assisting on the FBI task force project] to general investigative work because you broke up with Politano? A. Yes, I

7

believe that . . . . Q. Did [the officers who reassigned Novak] make any statements that would lead you to believe that you were removed from this assignment because of your sex? A. No."); 136:24-137:10 ("Q. Do you allege that you received a written counseling arising out of the incident in which you were late to the mandatory training session because you broke up with Lieutenant Politano? . . . A. There's a way of putting it but yes."); 172:11-14 ("Q. Are you alleging that you were assigned to office duty because you broke up with Lieutenant Politano? A. Yes."); 173:14-17 ("Q. Do you believe that Captain Politano intentionally omitted your name from this email [disseminating a shooting range schedule] because you broke up with him? A. Yes."); 175:5-9 ("Q. . . . . [O]n April 27th you were the only detective to whom newly hired detectives were not assigned, are you alleging that this was done because you broke up with Lieutenant Politano? A. Yes."); 178:22-179:2 ("Q. Okay. Are you alleging that Sergeant Brylinski asked you to submit a case management form in connection with your job responsibilities is because [sic] you broke up with Lieutenant Politano? A. Yes."); 184:8-13 ("Q. Nevertheless, you are still alleging that Sergeant Alexander came to check, to ensure that you were actually sick on a day that you used sick leave time because you broke up with Lieutenant Politano; is that correct? A. Yes.").

In DeCintio v. Westchester Cnty. Med. Ctr., 807 F.2d 304, 308 (2d Cir. 1986), the Second Circuit held that "voluntary, romantic relationships cannot form the basis of a [Title VII] sex discrimination suit," thus barring claims against a supervisor who recommended his romantic partner for promotion instead of plaintiffs. Courts in this district have since cited DeCintio in holding that Title VII sex discrimination claims may not be premised solely on evidence of mistreatment following the termination of a romantic relationship. See Kahn v. Objective Solutions, Int'l, 86 F. Supp. 2d 377, 382 (S.D.N.Y. 2000) ("Participation in a consensual office

affair does not constitute actionable gender discrimination when the termination of the affair results in discharge. It may constitute unfair and certainly unchivalrous behavior, but not discrimination because of gender."); Mastrototaro v. Consol. Edison Co., No. 87 Civ. 6962 (CSH), 1990 WL 47709, at *2 n.2 (S.D.N.Y. Apr. 12, 1990) ("Plaintiff's allegations centering on a consensual romantic involvement with a married member of Con Edison management do not form the basis for a sex discrimination claim . . . . The prohibitions against sex discrimination address themselves not to discrimination on account of one's sexual relationships, but rather to discrimination based on one's gender in and of itself.").

Novak makes no effort to distinguish these cases from her own case, but instead argues that "discriminatory animus may be based on evidence that a supervisor mistreated an employee because she rejected his sexual advances." (Opp'n 10.) The Court does not dispute this general principle, see Fitzgerald v. Henderson, 251 F.3d 345, 356 (2d Cir. 2001), which sounds in *quid pro quo* sexual harassment. There are clearly circumstances in which an employee's failed romantic relationship with a supervisor can lead to an actionable Title VII claim, such as when the employee's subsequent mistreatment can be tied to the rejected supervisor's unwanted sexual advances or other inappropriate efforts to resume the relationship. See Babcock v. Frank, 729 F. Supp. 279, 287-88 (S.D.N.Y. 1990) (inference of discrimination existed where, following plaintiff's decision to terminate romantic relationship with supervisor, he "threatened her with destruction of her career . . . if she did not return his affections and that when she no longer did, she suffered retaliation"); Perks v. Town of Huntington, 251 F. Supp. 2d 1143, 1150, 1157 (E.D.N.Y. 2003) (finding that where supervisor "repeatedly stalked [subordinate], demanding that they resume their relationship and threatening various consequences if they did not,"

constituted actionable discrimination).[4]

Where, as here, however, there is no evidence that the spurned supervisor made any sexual advances towards Novak following their breakup, or engaged in other efforts to renew the relationship, there is no actionable Title VII violation. See, e.g., Doherty v. Nederlander Producing Co., No. 04 Civ. 3324 (LTS) (JCF), 2006 WL 2239421, at *5 (S.D.N.Y. Aug. 4, 2006) (summary judgment for defendant appropriate on harassment claim where spurned co-worker's improper conduct was motivated by no more than "frustration about the failed relationship" and not by plaintiff's sex); Conklin v. Cnty. of Suffolk, 859 F. Supp. 2d 415, 428 (E.D.N.Y. 2012) ("[C]ourts often find that harassment by a co-worker is not considered to be 'based on sex' when it arises from a failed relationship."); Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F. Supp. 2d 248, 263 (E.D.N.Y. 2005) ("Conduct motivated by personal animosity does not run afoul of Title VII's prohibition against altering the terms and conditions of employment because of sex . . . .").

The Court has no reason to doubt that Novak was mistreated by Politano following their breakup, and it is not implausible that Politano's attitude towards Novak impacted the way her other supervisors treated her. But such mistreatment, while unfair and unfortunate, does not constitute Title VII sex discrimination under existing law.

### b. Adverse Employment Action

Even if Novak had produced evidence sufficient to give rise to an inference of

---

[4] See also Kaytor v. Elec. Boat Corp., 609 F.3d 537, 548 (2d Cir. 2010) (Title VII claims "may be premised on evidence that a supervisor heaped abuse on the plaintiff because she had rejected his sexual advances."). Judge Castel cited Kaytor in the 2011 Order to support his conclusion that "Plaintiff ha[d] set forth facts . . . from which a discriminatory motivation for an adverse employment action can be inferred." (2011 Order 7.) Novak appears to contend that Judge Castel's holding equates to a determination that Novak has established the final element of her *prima facie* discrimination case. (Opp'n 10.) To the contrary, Judge Castel, citing only the Complaint's allegations, made clear that "[t]he workplace hostility plaintiff experienced may or may not have risen to sex discrimination, but discovery is needed to make that determination." (2011 Order 7.)

discrimination, she has still failed to show that she suffered a legally cognizable adverse employment action. As the Second Circuit has explained, "[a] plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (citation and internal quotation marks omitted). Such an action "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Id.

Here, Novak did not suffer any of the employment actions typically considered to be adverse. She is still employed as a detective by the Waterfront Commission and was at no point demoted or denied an opportunity for promotion. She did not lose wages, vacation time or sick time and she was not formally disciplined during her employment at the Commission.

That Novak was assigned work she deemed "unfavorable" (office duty) and was removed from a project she apparently favored (assisting detectives on an FBI matter) does not mean she was subjected to a material adverse action. See Morrison v. Potter, 363 F. Supp. 2d 586, 590-91 (S.D.N.Y. 2005) ("[I]n order to qualify as an adverse employment action, a change in responsibilities must be so unsuited to plaintiff's skills as to constitute 'a setback to plaintiff's career' . . . subjective feelings about a change in job duties do not transform a reassignment into an adverse employment action.") (quoting Galabya, 202 F.3d at 641); see also Dotson v. City of Syracuse, No. 04 Civ. 1388, 2009 WL 2176127, at *10 (N.D.N.Y. July 21, 2009) ("[P]laintiff's preference for desk duty in lieu of road duty does not constitute adverse employment action under Title VII as it was not a materially significant disadvantage with respect to her employment.").

A similar analysis applies to Novak's allegation that she did "not receive any further formal Detective training, even though [she had] witnessed many co-workers being permitted to attend training." Although Novak nowhere goes so far as to allege that Defendants actually *denied* her permission to attend training, any such allegation would be unsupported by evidence that such denial affected "either plaintiff's opportunities for professional growth and career advancement or . . . plaintiff's compensation." Nakis v. Potter, No. 01 Civ. 10047 (HBP), 2004 WL 2903718, at *20 (S.D.N.Y. Dec. 15, 2004); see also Hill v. Rayboy-Brauestein, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006) ("When an employee cannot show material harm from a denial of training, such as a failure to promote or a loss of career advancement opportunities, there is no adverse employment action.").

Moreover, that Novak received a disproportionate number of evening and weekend shifts and was denied shift change requests are not, without more, events so material as to constitute adverse actions. Antonmarchi v. Consol. Edison Co., No. 03 Civ. 7735 (LTS) (KNF), 2008 WL 4444609, at *14 (S.D.N.Y. Sept. 29, 2008) ("[U]nfavorable hours do not constitute an adverse employment action for the purposes of Title VII."); Tompkins v. Allied Barton Sec. Servs., No. 09 Civ. 1954 (RMB) (JLC), 2010 WL 3582627, at *9 n.13 (S.D.N.Y. Aug. 2, 2010) ("[D]enial of a shift change request does not constitute an adverse employment action.").[5]

Nor do Novak's various claims of excessive scrutiny—questioning Novak's entitlement to overtime pay, singling Novak out during morning roll call, monitoring Novak's sick day usage—constitute adverse actions by Defendants. See Stoddard v. Eastman Kodak Co., 309 Fed. Appx. 475, 478-79 (2d Cir. 2009) ("[U]ndue and overly harsh criticism by [plaintiff's] boss" did

---

[5] In any event, Novak testified in her deposition that she did not subjectively consider working the evening shift to be unfavorable. (Provost Aff. Ex. A at 252:8-11 ("Q. So what you just testified to is that working the night shift is no more unfavorable than working the day shift. Right? A. That's correct."))

not constitute an adverse employment action.); Hill, 467 F. Supp. 2d at 354-55 ("[E]xcessive scrutiny and review by [plaintiff's] supervisors" is not an adverse employment action.).

Finally, while certain conduct by Defendants may have been harsh and offensive, it was not so egregious as to have constituted an adverse employment action. "Title VII prohibits discrimination; it is not a shield against harsh treatment at the work place. Personal animosity is not the equivalent of sex discrimination [and] [t]he plaintiff cannot turn a personal feud into a sex discrimination case." Doherty, 2006 WL 2239421, at *5 (internal punctuation omitted). Therefore, Politano's alleged hostile attitude or sarcastic remarks, for example, are not actionable. See, e.g., Barounis v. N.Y.C. Police Dep't, No. 10 Civ. 2631 (SAS), 2012 WL 6194190, at *12 (S.D.N.Y. Dec. 12, 2012) ("Although Barounis has offered proof that Lts. Medina and Algarin were hostile to him by yelling at him in front of co-workers and giving him a hard time—this is not an adverse employment action."); Scott v. City of N.Y. Dep't of Corr., 641 F. Supp. 2d 211, 231 (S.D.N.Y. 2009) ("[V]erbal abuse is typically insufficient to constitute an adverse employment action because negative or otherwise insulting statements are hardly even actions, let alone adverse actions.") (citation and internal punctuation omitted); Honey v. Cnty. of Rockland, 200 F. Supp. 2d 311, 321 (S.D.N.Y. 2002) ("The fact that [plaintiff's supervisor] did not engage plaintiff in conversation, and only addressed her if she first addressed him, does not constitute an adverse employment action.").

## 2. NYSHRL and NYCHRL Discrimination and Retaliation

Novak also brings sex discrimination claims, as well as retaliation claims,[6] under the NYSHRL and the NYCHRL.[7] Defendants argue that neither the NYSHRL nor the NYCHRL

---

[6] Novak did not assert a Title VII retaliation claim. (See Compl.; 2011 Order 7.)

[7] Because the Court has dismissed Novak's federal claim, it may "decline to exercise supplemental jurisdiction" over her state law claims. 28 U.S.C. § 1367(c)(3). To determine whether or not to exercise such

13

apply to the Waterfront Commission. The Court agrees.

Bi-state entities created pursuant to the Compact Clause of the U.S. Constitution[8] "are not subject to the unilateral control of any one of the States that compose the federal system." Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 42 (1994). The Waterfront Commission is such a bi-state entity, as it was established by an interstate compact that was approved by Congress. See N.J. Stat. Ann. § 32:23-1, et seq.; N.Y. Unconsol. Law § 9801, et seq., approved Pub. L. No. 252-407, 67 Stat. 541 (1953); see also Malverty v. Waterfront Comm'n, 71 N.Y.2d 977, 979 (1988). In Malverty, the New York Court of Appeals addressed whether article 23-A of the New York Correction Law,[9] prohibiting employment discrimination against persons with criminal records, applied to the Waterfront Commission. Id. The Malverty court first described the nature of the interstate compact governing the Commission:

> The Waterfront Commission was established by Interstate Compact [and] approved by Congress. . . . New York and New Jersey have agreed, and Congress has authorized the two States, to amend and supplement the Interstate Compact, to implement the purposes thereof, by legislative action of either State concurred in by legislative action of the other State . . . [T]he "Compact" between the two States includes the Interstate Compact approved by Congress and any duly enacted amendments or any supplements thereto. In the past, the New York Legislature has expressly stated that certain legislation was amending a certain

---

jurisdiction, courts balance the "values of judicial economy, convenience, fairness, and comity." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988). The court finds that those factors weigh in favor of declining jurisdiction over Novak's state common law claims. Id. at 350 n.7 ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining jurisdiction over the remaining state-law claims."). However, because "[t]he same substantive standards apply to claims of employment discrimination under Title VII . . . and the NYSHRL," Joseph v. Marco Polo Network, Inc., No. 09 Civ. 1597 (DLC), 2010 WL 4513298, at *7 (S.D.N.Y. Nov. 10, 2010), it is appropriate to retain jurisdiction over Novak's NYSHRL discrimination claim given that the Court has adjudicated her Title VII discrimination claim. See Mendez-Nouel v. Gucci America, Inc., 10 Civ. 3388 (PAE), 2012 WL 5451189, at *17 (S.D.N.Y. Nov. 8, 2012) ("Forcing [defendant] to defend against [plaintiff's] NYSHRL claims in state court, when this Court has already invested the judicial resources to resolve them, does not advance the interests of judicial economy, convenience, or fairness."). The Court further finds that the above-referenced values are best served by exercising jurisdiction over Novak's remaining NYSHRL claim and her NYCHRL claims as well.

[8]   The Compact Clause provides that, "No State shall, without the Consent of Congress . . . enter into any Agreement or Compact with another State." U.S. Const. Art. I, § 10, cl. 3.

[9]   See N.Y. Correct. Law § 752.

portion of the "Compact" and that the new law would take effect upon the enactment into law by New Jersey of legislation having an effect identical to New York's legislation, unless New Jersey had already done so, in which case the amendment would take effect immediately.

Id. at 979-980 (citations omitted). In light of that background, the Malverty court held the law to be inapplicable to the Commission, reasoning that:

> In the present case, the absence from the text and legislative history of article 23-A of any reference to the Waterfront Commission, coupled with the absence of an express statement that the Legislature was amending or supplementing the provisions of the "Compact" and that article 23-A would take effect upon the enactment by New Jersey of legislation of identical effect, if it had not already done so, indicates that the New York Legislature never intended article 23-A to apply to the Waterfront Commission.

Id. at 980.

Although the Court is unaware of cases holding the NYSHRL and NYCHRL to be inapplicable to the Waterfront Commission, there is substantial and convincing precedent indicating that the NYSHRL and NYCHRL do not apply to the Port Authority of New York and New Jersey ("Port Authority"), another Compact Clause entity. See Dezaio v. Port Auth., 205 F.3d 62, 65 (2d Cir. 2000) ("[N]either New York anti-discrimination law nor the State Division of Human Rights' jurisdiction extends to the Port Authority."); Moss v. Port Auth., No. 04 Civ. 9631 (GEL), 2006 WL 3392693, at *6 (S.D.N.Y. Nov. 20, 2006) ("New York's anti-discrimination law does not apply to the [Port Authority], an interstate agency."); Mack v. Port Auth., 225 F. Supp. 2d 376, 391 (S.D.N.Y. 2002) ("New York anti-discrimination laws do not apply to the Port Authority because it is a bi-state agency created by compact."); Settecase v. Port Auth., 13 F. Supp. 2d 530, 535-36 (S.D.N.Y. 1998) (in dismissing NYCHRL claims, stating that, because the Port Authority "compact does not allow for unilateral municipal legislation, New York City cannot unilaterally impose its HRL on the Port Authority."); Rose v. Port Auth., 13 F. Supp. 2d 516, 523-24 (S.D.N.Y. 1998) (same); Baron v. Port Auth., 968 F. Supp. 924, 929

(S.D.N.Y. 1997) (dismissing New York HRL and analogous New Jersey anti-discrimination law claims because, although both states "evinced the same, or similar, public policy regarding employment opportunities," neither statute "expressly states that they are adding to [Port Authority] responsibilities nor do they even make mention of the bi-state agency.") (quoting Malverty, 71 N.Y.2d at 979); Salvador-Pajaro v. Port Auth., 52 A.D.3d 303, 303-04 (1st Dep't 2008) (Port Authority "is not subject to New York legislation governing . . . employer/employee relations . . . absent concurring legislation by New Jersey, and absent any reference to the agency in the statute or its legislative history.") (citations omitted).

Nothing in the relevant statutes, the case law or the record in this case gives the Court pause in concluding that the principles that courts have repeatedly applied to the Port Authority in this arena may be applied equally to the Waterfront Commission.[10]  The Court finds no reference to the Commission in either the text or legislative history of the two anti-discrimination statutes,[11] nor is there an express statement by the Legislature amending or supplementing the provisions of the Commission's Compact.  Additionally, Novak has not raised any serious

---

[10]    Judge Castel declined to dismiss Novak's NYSHRL and NYCHRL claims on this ground at the pleadings stage, stating that "dismissing the claims on this ground would be inappropriate at [this] time" in part because the cases cited by Defendants "relie[d] on facts specific to the Port Authority that may not correspond to the Commission." (2011 Order 9). On a full record, this Court may "reconsider[] issues on summary judgment that have initially been raised in the context of a motion to dismiss." Nobel Ins. Co. v. City of N.Y., No. 00 Civ. 1328 (KMK), 2006 WL 2848121, at *4 (S.D.N.Y. Sept. 29, 2006); see also Day Springs Enters. v. LMC Int'l, Inc., No. 98 Civ. 0658A(F), 2004 WL 2191568, at *13 (W.D.N.Y. Sept. 24, 2004) ("[W]here a party has argued an issue during one motion before a given judge, the [law of the case] doctrine does not necessarily preclude a different judge from considering the same argument proffered during a subsequent motion for summary judgment.") (internal punctuation omitted). In any event, Novak makes no argument here that the 2011 Order precludes the Court's consideration of this issue on summary judgment.

[11]    That New Jersey has also enacted state anti-discrimination legislation, see N.J. Stat. Ann. § 10:5-1, et seq., is not sufficient under the express terms of the Compact to render it amended such that the Commission would be subject to New York's state and local anti-discrimination laws. See Malverty, 71 N.Y.2d at 980 (that New York and New Jersey "ha[d] evinced the same, or similar, public policy regarding employment opportunities for former inmates by enacting similar 'antidiscrimination' laws is not sufficient under the express terms of the 'Compact' to render it properly amended or supplemented such that the Commission would be subject to the [law's] provisions.").

factual or legal argument that would preclude such application.[12]

Novak's NYSHRL and NYCHRL claims are therefore dismissed as to the Waterfront Commission, and by logical extension, the individual Defendants. See Evans v. Port Auth., 192 F. Supp. 2d 247, 281-82 (S.D.N.Y. 2002) ("Defendants are correct that the respective antidiscrimination laws of New York and New Jersey do not apply to the Authority because it is an agency created by an interstate compact. *A fortiori*, they do not apply to the Authority's agents acting in their capacities as such.").

### 3. State Common Law Claims

As explained above at footnote seven, the Court declines to exercise supplemental jurisdiction over Novak's state common law claims. See Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) ( "[I]f the federal law claims are dismissed before trial . . . the state claims should be dismissed as well.").

### CONCLUSION

For the reasons stated above, Defendants' motion is granted in its entirety. The Clerk of Court is directed to close item number thirty-nine (39) on the docket and to terminate this action.

SO ORDERED.

Dated:     March 1, 2013
           New York, New York

_____
Ronnie Abrams
United States District Judge

---

[12] Indeed, Novak cites no case law on this point at all, urging the Court instead to adopt a rule that would "apply both New York and New Jersey State law to the Waterfront Commission [where] the controlling law would be based on the state in which the cause of action is brought." (Opp'n 9.) Among other problems, that unsupported approach would improperly permit the laws of a forum state in a given suit to unilaterally regulate the operations of the Compact Clause entity. See Hess, 513 U.S. at 42 & n.11.